IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------x
                                      :
GAIL A. LANOUE                        :        3:07 CV 1756 (JBA)
                                      :
                                      :
                                      :
v.                                    :
                                      :
THE PRUDENTIAL INSURANCE              :        DATE: MARCH 20, 2009
COMPANY OF AMERICA                    :
                                      :
-------------------------------------------------x
```

<u>RECOMMENDED RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

On October 24, 2007, plaintiff Gail A. Lanoue commenced this action against defendant The Prudential Insurance Company of America ["defendant" or "Prudential"] in the Connecticut Superior Court, Judicial District of Norwich at New London, which case was removed to this Court by defendant Prudential on November 29, 2007. (Dkt. #1). On January 24, 2008, plaintiff filed her Amended Complaint, alleging that defendant improperly denied her claim for long term disability benefits in violation of the Employee Retirement Income Security Act of 1974, as amended ["ERISA"], 29 U.S.C. § 1132(a)(1)(B). (Dkt #15; <u>see</u> Dkts. ##12, 14).

On November 26, 2008, the parties filed cross-motions for summary judgment, with briefs, Local Rule 56 Statements, and exhibits in support. (Dkts. ##29-32).[1] Two days prior, the parties filed the Stipulated Administrative Record. (Dkt. #28).[2] On December 17, 2008,

---

[1]Attached to plaintiff Motion for Summary Judgment (Dkt. #29) is plaintiff's Local Rule 56(a)1 Statement, and her brief in support.

Defendant's Motion for Summary Judgment (Dkt. #30) was filed separately from its Local Rule 56(a)1 Statement (Dkt. #31), and from its brief in support (Dkt. #32).

[2]The Stipulated Administrative Record consists of 141 exhibits. Some of the exhibits appear more than once in the record.

plaintiff filed her brief in opposition to defendant's Motion for Summary Judgment (Dkt. #36), and the next day, defendant filed its brief in opposition to plaintiff's Motion for Summary Judgment, and opposition to plaintiff's Local 56(a)1 Statement (Dkts. ##37-38).   On December 30, 2008, plaintiff and defendant filed their reply briefs.  (Dkts. ##39-40).

On December 8, 2008, United States District Judge Janet Bond Arterton referred these motions to this Magistrate Judge for a recommended ruling.  (Dkt. #35).

For the reasons stated below, plaintiff's Motion for Summary Judgment (Dkt. #29) is <u>granted</u>, and defendant's Motion for Judgment on the Administrative Record (Dkt. #30) is <u>denied</u>.

## I. FACTUAL BACKGROUND[3]

Plaintiff was employed at the Mohegan Tribal Gaming Authority as a table games floorperson from October 8, 1997 to February 4, 2006. (Defendant's 56(a)1 Statement ¶ 1; Plaintiff's 56(a)1 Statement ¶¶ I.1-2; Defendant's 56(a)2 Statement ¶¶ I.1-2; Exh. 4, GAL 0057-0058).  As part of her employment, plaintiff was offered insurance coverage under a Long Term Disability Plan ["the Plan"], the operative documents of which consist of a Group Insurance Contract, a Long Term Disability Coverage policy, and a Summary Plan Description.  (Defendant's Statement 56(a)1 Statement ¶ 2; Plaintiff's 56(a)1 Statement ¶ II.1; Defendant's 56(a)2 Statement ¶ II.1; Exhs. 1-2, GAL 0001-0053).  Defendant funds the Plan and evaluates the claims for benefits (Plaintiff's 56(a)1 Statement  ¶ II.4; Defendant's 56(a)1 Statement ¶ 7; Defendant's 56(a)2 Statement ¶ II.4; Exh. 1, GAL 0002, 0049), and

_____

[3]The following factual summary is drawn from plaintiff's Rule 56(a)1 Statement of Facts (Dkt. #29-2)["Plaintiff's 56(a)1 Statement"], defendant's Local Rule 56(a)2 Statement of Facts (Dkt. #37)["Defendant's 56(a)2 Statement"], and defendant's Local Rule 56(a)1 Statement of Facts (Dkt. #31)["Defendant's 56(a)1 Statement"], and the accompanying administrative record.  Such factual summary, therefore, does not represent factual findings of the Court.

under the terms of the Plan, Mohegan Tribal Gaming Authority is named the "plan administrator." (Defendant's 56(a)1 Statement ¶ 6; Exh. 1, GAL 0048). The Plan documents provide that Prudential is the claims manager for the Plan, and as such, is responsible for evaluating all claims for long term disability benefits under the Plan and has "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." (Defendant's 56(a)1 Statement ¶ 7; Exh. 1, GAL 0049).

A. THE PLAN

The Summary Plan Description provides: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (Plaintiff's 56(a)1 Statement ¶ II.2; Defendant's 56(a)2 Statement ¶ II.2; Exh. 2, GAL 0049). Under the terms of the Plan, "Total Disability" exists when Prudential determines that all of the following conditions are met:

> You are disabled when Prudential determines that:
>
> - you are unable the perform the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

(Defendant's 56(a)1 Statement ¶ 3; Plaintiff's 56(a)1 Statement ¶ II.3; Defendant's 56(a)2 Statement ¶ II.3; Exh. 2, GAL 0024)(emphasis in original)). The Plan's "elimination period" is the first ninety days of being "continuously disabled." (Defendant's Statement ¶ 5; Exh. 1, GAL 0025).

3

## B. PLAINTIFF'S CLAIM FOR LONG-TERM DISABILITY BENEFITS

On April 11, 2006, plaintiff applied for Long Term Disability Benefits under the Plan. (Defendant's 56(a)1 Statement ¶ 8; Plaintiff's 56(a)1 Statement ¶ III.1; Defendant's 56(a)2 Statement ¶ III.1; Exh. 3, GAL 0054).   On July 5, 2006, plaintiff submitted an Employee Statement and an Attending Physician's Statement ["APS"];  plaintiff characterized her job duties as "light" work.  (Defendant's 56(a)1 Statement ¶ 10; Plaintiff's 56(a)1 Statement ¶ III.2; Defendant's 56(a)2 Statement ¶ III.2; Exh. 8, GAL 0067-0073).  Dr. Sandeep Varma, plaintiff's treating rheumatologist, authored the APS, in which he also characterized plaintiff's job duties as "light" work.  (Defendant's 56(a)1 Statement ¶ 11; Exh. 8, GAL 0070-0071).

On July 12, 2006, Prudential Disability Consultant, Christopher Brown, wrote to plaintiff requesting additional information in order to determine her eligibility for benefits. (Defendant's 56(a)1 Statement ¶ 12; Plaintiff's 56(a)1 Statement ¶ III.3; Defendant's 56(a)2 Statement ¶ III.3; Exh. 10, GAL 0075-0076).[4]  On August 1, 2006, plaintiff submitted a "Comprehensive Claimant Statement" on a form prepared by defendant, in which she complained of fibromyalgia, chronic pain, and fatigue.  (Plaintiff's 56(a)1 Statement ¶ III.4; Defendant's 56(a)2 Statement ¶ III.4; Exh. 14, GAL 0090-0096).  Plaintiff noted that she was taking methadone and Cymbalta for pain, and Nadodol for migraine headaches, and she complained of an inability to stand for long periods, severe headaches, constant pain, an inability to focus, concentrate or understand and follow directions, and trouble sleeping. (Id.; Exh. 14, GAL 0090-0094).  She stated that she required intermittent assistance with her activities of daily living such as bathing and dressing and she stated she avoided driving

---

[4]Plaintiff has two ¶ III.3.  (See Plaintiff's 56(a)1 Statement).  For ease of reference, the Court has renumbered the paragraphs accordingly.

unless absolutely necessary because she often got lost since her pain affected her ability to concentrate. (Id.; Exh. 14, GAL 0092-0094).

On August 18, 2006, defendant notified plaintiff that it would need an extension of time to complete its review and make a decision. (Plaintiff's 56(a)1 Statement ¶ III.5; Defendant's 56(a)2 Statement ¶ III.5; Exh. 16, GAL 0107-0108). Eight days later, defendant notified plaintiff that it denied her claim, in which notice defendant did not identify its internal medical consultant. (Plaintiff's 56(a)1 Statement ¶ III.6; Defendant's 56(a)2 Statement ¶ III.6; Exh. 17, GAL 0109-0113).

### 1. PLAINTIFF'S FIRST APPEAL

On October 30, 2006, plaintiff appealed defendant's decision to deny her disability benefits, and around this same date, plaintiff submitted a statement titled, "A Day in the Life of Gail Lanoue," detailing the difficulties she encountered in a typical day. (Plaintiff's 56(a)1 Statement ¶ III.7; Defendant's 56(a)2 Statement ¶ III.7; Defendant's 56(a)1 Statement ¶ 14; Exh. 22, GAL 0138-0146; Exh. 23, GAL 0148-0150).

On December 19, 2006, defendant sent all available medical documentation to Dr. Paul Howard, who is both an internist and rheumatologist, for an independent medical review, accompanied by a detailed letter. (Plaintiff's 56(a)1 Statement ¶ III.8; Defendant's 56(a)2 Statement ¶ III.8; Defendant's 56a1 Statement ¶ 15; Exh. 26, GAL 0158-0159; Exh. 117, GAL 0305-0311). By letter dated January 10, 2007, Prudential Senior Appeals Analyst, Angi Holland, informed plaintiff that Prudential completed a review of her first request for reconsideration and determined that its decision to deny benefits was appropriate and would be upheld. (Defendant's 56(a)1 Statement ¶ 16, Plaintiff's 56(a)1 Statement ¶ III.9; Defendant's 56(a)2 Statement ¶ III.9; Exhs. 27-28, GAL 0160-64).

## 2. PLAINTIFF'S SECOND APPEAL

On February 13, 2007, plaintiff's newly obtained counsel requested copies of the record in the case from plaintiff and notified Prudential that plaintiff was considering submitting a second appeal of Prudential's decision to disallow benefits.  (Plaintiff's 56(a)1 Statement ¶ III.10; Defendant's 56(a)2 Statement ¶ III.10; Defendant's 56(a)1 Statement ¶ 18; Exh. 30, GAL 0167-0168).   On March 5, 2007, defendant responded to plaintiff's counsel, enclosing copies of documents.  (Plaintiff's 56(a)1 Statement ¶ III.11; Defendant's 56(a)2 Statement ¶ III.11; Exh. 31, GAL 0169).   On July 6, 2007, plaintiff filed a second appeal with defendant, which included additional medical records and a report from Dr. Varma.   (Plaintiff's 56(a)1 Statement ¶ III.12; Defendant's 56(a)2 Statement ¶ III.12; Defendant's 56(a)1 Statement ¶ 19; Exh. 32, GAL 0170-0173).   In his letter, plaintiff's counsel stated that the "record now also demonstrates that [plaintiff] suffers from a serious mental impairment.  This impairment must be considered in combination with her physical impairments." (Plaintiff's 56(a)1 Statement ¶ III.12; Defendant's 56(a)2 Statement ¶ III.12; Exh. 32, GAL 0171).

On July 17, 2007, defendant sent plaintiff's additional records to Dr. Howard. (Defendant's 56(a)2 Statement ¶ 20; Plaintiff's 56(a)1 Statement ¶ III.13, Defendant's 56(a)2 Statement ¶ III.13; Exh. 34, GAL 0175; see Exh. 131, GAL 0336-0340).  On July 24, 2007, Dr. Howard completed his review of the additional materials submitted to him and responded to Prudential's list of questions concerning whether the additional material changed his opinion; the new records did not change his previous assessment of plaintiff's disability. (Defendant's 56(a)1 Statement ¶ 21; Exh. 131, GAL 0336-0340).  On August 3, 2007, Ms. Holland informed plaintiff's attorney that Prudential completed its review and determined that

its decision to deny benefits to plaintiff was appropriate and would be upheld.  (Plaintiff's 56(a)1 Statement ¶ III.14; Defendant's 56(a)2 Statement ¶ III.14; Defendant's 56(a)1 Statement ¶ 22; Exh. 35, GAL 0176-0178).[5]

### C. MEDICAL EVIDENCE AND EVALUATION THEREOF

As stated earlier, plaintiff's treating physician for her fibromyalgia is Dr. Varma, a rheumatologist.  (Plaintiff's 56(a)1 Statement ¶ IV.1; Defendant's 56(a)2 Statement ¶ IV.1; Exh. 8, GAL 0071).  In her own statement, plaintiff stated that she suffered from pain, fatigue, and an inability to stand or sit for more than ten minutes.  (Plaintiff's 56(a)1 Statement ¶ IV.2; Defendant's 56(a)2 Statement ¶ IV.2; Exh. 8, GAL 0073).  In March 2006, Dr. Varma referred plaintiff to Dr. David Tinklepaugh for a neurological evaluation. (Plaintiff's 56(a)1 Statement ¶ IV.4; Defendant's 56(a)2 Statement ¶ IV.4; Exh. 13, GAL 0081-0082; Exh. 78, GAL 0225-0227; Exh. 80, GAL 0230-0231).[6]  Dr. Tinklepaugh noted plaintiff's "chief complaint of burning in hands and feet," that she has had "for maybe as long as [six] years or so intermittently, but in the last [eighteen] months things have really ramped up and gotten worse."  (Plaintiff's 56(a)1 Statement ¶ IV.4; Defendant's 56(a)2 Statement ¶ IV.4;  Exh. 13, GAL 0082; Exh. 80, GAL 0230).  Dr. Tinklepaugh's impression was parasthesias numbness dysethesias, polyneuropathy, and multiple sclerosis, and he recommended further testing in light of her family history.  (Id.; Exh. 13, GAL 0083; Exh. 80, GAL 0231).

On April 12, 2006, Dr. Tinklepaugh concluded that plaintiff's MRI did "not show any

---

[5]While defendant denied plaintiff's request three times, it is from the last of these decisions that she is taking her appeal.  (Dkt. #36, at 2).

[6]Once again, plaintiff has two ¶ IV.3, so that ¶ IV.3-IV.18 are numbered incorrectly.  (See Plaintiff's 56(a)1 Statement).  For ease of reference, the Court has renumbered these paragraphs accordingly.

evidence of demyelinating disease or other pathology." (Plaintiff's 56(a)1 Statement ¶ IV.5; Defendant's 56(a)2 Statement ¶ IV.5; Exh. 13, GAL 0084; Exh. 81, GAL 0232).   In June 2006, Dr. Tinklepaugh reported that plaintiff's symptoms remained the same as those found in March.  (Plaintiff's 56(a)1 Statement ¶ IV.6; Defendant's 56(a)2 Statement ¶ IV.6; Exh. 13, GAL 0085).   The record includes relevant medical records from plaintiff's primary care physician, Dr. Yogesh Katechia (Plaintiff's 56(a)1 Statement ¶ IV.7; Defendant's 56(a)2 Statement ¶ IV.7; Exh. 37, GAL 0180; Exh. 39, GAL 0182; Exh. 40, GAL 0183; Exh. 45, GAL 0188; Exh. 57, GAL 0200; Exh. 61, GAL 0204; Exh. 66, GAL 0209; Exh. 68, GAL 0212), records from her chiropractor (Plaintiff's 56(a)1 Statement ¶¶ IV.8, 12; Defendant's 56(a)2 Statement ¶¶ IV.8, 12; Exh. 53, GAL 0196; Exh. 54, GAL 0197, Exh. 73, GAL 0217-0218), and  records from Dr. Varma (Plaintiff's 56(a)1 Statement ¶¶ IV.9-11; Defendant's 56(a)2 Statement ¶¶ IV.9-11; Exh. 71, GAL 0215; Exh. 15, GAL 0100-0106; Exh. 75, GAL 0220-0221; Exh. 98, GAL 0267-0269; Exh. 100, GAL 0271-0276; Exh. 109, GAL 0283-0286; Exh. 114, GAL 0293; Exh. 115, GAL 0295-0301; Exh. 116, GAL 0302; Exh. 121, GAL 0320-0321; Exh. 127, GAL 0329-0330).

Plaintiff has been taking yoga classes since January 2006.   (Plaintiff's 56(a)1 Statement ¶ IV.15; Defendant's 56(a)2 Statement ¶ IV.15; Exh. 21, GAL 0133-0137).  In its August 24, 2006 decision to deny plaintiff's claim for long term disability benefits, defendant stated that "[i]t . . . appears you started [y]oga . . . while in pain, and it again appears the severity of your pain is intermittent[,] allowing you to participate in activities outside of the home."  (Plaintiff's 56(a)1 Statement ¶ IV.15; Defendant's 56(a)2 Statement ¶ IV.15; Exh. 17, GAL 0112).

On September 7, 2006, Dr. Tonya Hall, a gastroenterologist, noted that plaintiff was

seen for a "follow-up evaluation of abnormal liver function tests, which are most likely secondary to fatty liver/non-alcoholic fatty liver disease." (Plaintiff's 56(a)1 Statement ¶ IV.13; Defendant's 56(a)2 Statement ¶ IV.13; Exh. 101, GAL 0273). In that month she had a migraine that lasted for three days, during which time she was confined to her bed and experienced sharp lower back pain. (Plaintiff's 56(a)1 Statement ¶ IV.13; Defendant's 56(a)2 Statement ¶ IV.13; Exh. 104, GAL 0277). She continued to experience lower back pain and to have trouble sleeping through October 2006. (Plaintiff's 56(a)1 Statement ¶ IV.13; Defendant's 56(a)2 Statement ¶ IV.13; Exh. 106, GAL 0279).

In October 2006, plaintiff completed a Pain Disability Index in which she reported very high levels of pain, but still reported that she was trying to stay positive. (Plaintiff's 56(a)1 Statement ¶ IV.14; Defendant's 56(a)2 Statement ¶ IV.14; Exh. 113, GAL 0291-0292). She related that she stayed in bed three days a week, and she scored very low on the "Quality of Life" Scale. (Plaintiff's 56(a)1 Statement ¶ IV.14; Defendant's 56(a)2 Statement ¶ IV.14; Exh. 113, GAL 0291-0292).

On December 8, 2006, Factual Photo, Inc., a private detective agency, submitted a surveillance report about plaintiff to defendant, in which the detectives reported that during the surveillance period, they videotaped plaintiff as she opened the front door to let a dog into the house. (Plaintiff's 56(a)1 Statement ¶ IV.16; Defendant's 56(a)2 Statement ¶ IV.16; Exh. 135, GAL 0349-0353). On January 2, 2007, Dr. Howard completed an independent peer review in which he responded to five questions relating to plaintiff. (Plaintiff's 56(a)1 Statement ¶ IV.17; Defendant's 56(a)2 Statement ¶ IV.17; Exh. 117, GAL 0305-0311).

In February 2007, Dr. Varma took plaintiff off Lyrica. (Plaintiff's 56(a)1 Statement ¶ IV.18; Defendant's 56(a)2 Statement ¶ IV.18; Exh. 121, GAL 0320-0321). On February 19,

2007, plaintiff began mental health treatment at Select Behavioral Health, LLC.  (Plaintiff's 56(a)1 Statement ¶ IV.19; Defendant's 56(a)2 Statement ¶ IV.19; Exh. 120, GAL 0315-0319).   In an assessment form, dated February 28, 2007, plaintiff's treating clinician indicated that plaintiff was depressed, her motor activities were excessively slow, she lacked insight and her short term memory was impaired.   (Plaintiff's 56(a)1 Statement ¶ IV.19; Defendant's 56(a)2 Statement ¶ IV.19; Exh. 122, GAL 0322-0324; Exh. 123, GAL 0325; Exh. 124, GAL 0326; Exh. 125, GAL 0327; Exh. 126, GAL 0328).   Subsequent treatment notes reflect her "hist[ory] of pain," and migraines.   (Plaintiff's 56(a)1 Statement ¶ IV.19; Defendant's 56(a)2 Statement ¶ IV.19;  Exh. 123, GAL 0325; Exh. 124, GAL 0326; Exh. 125, GAL 0327; Exh. 126, GAL 0328).

On July 3, 2007, Dr. Varma authored a report in which he noted that plaintiff's "diagnoses are amply supported in the medical records."  (Plaintiff's 56(a)1 Statement ¶ IV.20; Defendant's 56(a)2 Statement ¶ IV.20;  Exh. 130, GAL 0333-0335).  On July 24, 2007, Dr. Howard authored an addendum to his report, which defendant considered as part of its final review of plaintiff's claim for long term disability benefits.  (Plaintiff's 56(a)1 Statement ¶ IV.21; Defendant's 56(a)2 Statement ¶ IV.21;  Exh. 131, GAL 0337-0340).

D. PROCEDURAL POSTURE

Following defendant's second denial of plaintiff's claim for benefits, plaintiff, through counsel, commenced this action under ERISA.  (Defendant's Statement 56(a)1 ¶ 24).  The parties agree that because this is an ERISA action, they are not entitled to conduct discovery other than that limited to determining what evidence was before defendant when it made its final decision on plaintiff's claim.  (Id. ¶ 25).

## II. DISCUSSION

The standard for summary judgment is well established.  The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Upon motion, following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party:

> who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any."  FED. R. CIV. P. 56(c).  "On summary judgment the inferences to be drawn from the underlying facts contained in the [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970), quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)(citations & internal quotation marks omitted).  Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact."  Adickes, 398 U.S. at 153.

11

A. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. #29)

        The parties agree that the arbitrary and capricious standard of review is applicable to this case (Dkt. #29, Brief, at 1-2; Dkt. #38, at 1-3), and according to plaintiff, under such standard, defendant's determination was arbitrary and capricious due to an inherent conflict of interest on the part of defendant,[7] the failure of defendant to properly consider plaintiff's allegations of pain and fatigue, defendant's reliance on the absence of signs and symptoms not relevant to plaintiff's illness, defendant's failure to have plaintiff personally examined, the consultative examiner's failure to consult with the treating physician,  defendant's failure to give proper weight to the treating physician, defendant's selective readings from the medical records, and  defendant's continuous insistence on the lack of "objective" evidence with respect to a  disease that cannot be measured in that way. (Dkt. #29, Brief, at 6-18). Further, plaintiff argues that defendant relied entirely on the opinion of its "independent peer review" in making its decision in this case, thus making it subject to review (id. at 3-6), and plaintiff is unable to work and is entitled to benefits under the policy.  (Id. at 18-19).

        In response, defendant argues that its decision is entitled to due deference under the arbitrary and capricious standard (Dkt. #38, at 1-3); plaintiff erroneously argues that defendant has the burden of presenting sufficient evidence to support its decision as the burden of proof rests with plaintiff (id. at 3-4);[8] defendant's decision was not affected by an

_____

        [7]As discussed further below, plaintiff argues that defendant was operating under an inherent conflict as defendant is responsible for making the decision of eligibility as well as responsible for the payment of benefits. (Id. at 2-3).

        [8] "[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered," and consistent with this statement of law, the Second Circuit has held that in an ERISA disability benefits action, the plaintiff "has the burden of proving by a preponderance of the evidence that he [or she] is totally disabled within the meaning of the [P]lan." Paese v. Hartford Life and Accident Ins. Co.,449 F.3d 435, 441 (2d Cir. 2006)(internal quotations & citation omitted).  Thus, the burden of establishing that she is disabled lies with plaintiff in this action.  ___

"inherent conflict" (id. at 4-6); defendant's denial was based on a thorough evaluation of all of the information provided to it by plaintiff and her healthcare providers, including her subjective reports of pain and fatigue (id. at 6-9); defendant's denial of benefits was reasonable as the medical records and other materials do not document any specific limitations or restrictions on her ability to work (id. at 9-16); and defendant acted reasonably when it chose not to have plaintiff personally examined, as the Plan is not required to defer to treating physicians and reviewing physicians are not required to consult with treating physicians.  (Id. at 16-18).

In plaintiff's reply brief, she argues that many of the arguments posited by defendant amount to post hoc reasoning and questioning of plaintiff's underlying diagnosis. (Dkt. #39).

## 1. STANDARD OF REVIEW

As stated above, the parties agree that the denial of benefits in this case is to be reviewed under the "arbitrary and capricious" standard of review.  Such standard of review is applicable when an employee benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Defendant is the Plan Administrator, vested with the "sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits."  (Exh. 2, GAL 0049).

Under the arbitrary and capricious standard, the scope of judicial review is "narrow," and the plan administrator's decision to deny benefits will "only be overturned if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Karanda v. CT Gen'l Life Ins. Co., 158 F. Supp. 2d 192, 198 (D. Conn. 2000)(internal

quotations & citation omitted).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." Smith v. Champion Int'l Corp., 573 F. Supp. 2d 599, 615 (D. Conn. 2008)(citation & internal quotations omitted). This Court can not substitute its judgment for that of the administrator, but instead, must function "in an appellate capacity and must limit review to the evidence that was in the administrative record available to the plan administrator." Karanda, 158 F. Supp. 2d at 198 (internal quotations & multiple citations omitted).  On November 24, 2008, defendant filed the 430-page administrative record with the Court.  (Dkt. #28).

　　　　　　　　2. INHERENT CONFLICT

　　　　　　As stated above, Prudential is both the insurer and the claims manager for the Plan, and as such, is responsible for evaluating all claims for long term disability benefits under the Plan, has "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits," and pays benefits to those found eligible. (Exh. 1, GAL 0049).  An inherent conflict of interest exists when the same entity funds the plan and evaluates the claims, as "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket." Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348, 171 L. Ed. 2d 299 (2008)["Glenn"](citation & internal quotations omitted).  Prior to the United States Supreme Court's decision last summer in Glenn, in cases in which the plan administrator was shown to have a conflict of interest and was influenced by that conflict, the court would interpret the plan de novo.  See Sullivan v. LTV Aerospace & Defense Co., 82 F.3d 1251, 1255-56 (2d Cir. 1996).  However, in Glenn, the Supreme Court held that the arbitrary and capricious standard of review is still

appropriate, but that courts must take into account the conflict of interest and weigh such conflict as a factor in determining whether there was an abuse of discretion.  128 S. Ct. at 2350-51; see McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008).

### 3.  DECISION TO DENY

In defendant's initial denial of Long Term Disability Benefits, dated August 24, 2006, defendant refers to the March 15 to July 10, 2006 treatment notes of Drs. Varma and Tinklepaugh, and concludes that its "medical consultant review" determined that plaintiff sustained functional capacity for light work.   (Exh. 17, GAL 0109-0113; Exh. 18, GAL 0114-0116).  The medical consultant review, authored by Susan Palermo, RN,  dated August 23, 2006, and entitled "Capacity/Clinical Review," references plaintiff's treating physician's records, plaintiff's self-reports, and plaintiff's activities including her yoga classes[9] and her trip to Florida.[10]  (Exh. 138, GAL 0361-0362).

In its January 10, 2007 denial of plaintiff's first appeal, defendant notes that Dr. Varma signed the APS on June 9, 2006, opining diagnoses of fibromyalgia and low vitamin D, and noting that plaintiff has "light functional capacity." (Exh. 27, GAL 0160-0163).[11]  In this denial notice, defendant informed plaintiff that "[a]lthough all medical documentation was reviewed on appeal, not all medical data will be referenced in this letter" that

---

[9]See note 17 infra.

[10]Plaintiff traveled to Florida after she was diagnosed with a vitamin D deficiency.  (Exh. 88, GAL 0242-44).  Her trip required her to increase her pain medication.  (Id.).

[11]In that APS, Dr. Varma also noted plaintiff's pain, fatigue and inability to focus as "[m]edical [o]bstacles to [r]eturn to [w]ork." (Exh. 8, GAL 0071).  Defendant does not reference this in its decision, and argues in its brief that its explicit reference to Dr. Varma's assessment of plaintiff's functional capacity in the initial denial and in this second decision put plaintiff on notice that this was a determinative medical opinion, and one which, if plaintiff contested, could have been addressed in Dr. Varma's additional medical records.

documented the reasons for its denial of plaintiff's appeal.  (Exh. 27, GAL 0161).  However,

defendant quoted extensively from the opinion of its "physician-reviewer," namely that of Dr.

Howard, as to plaintiff's functional impairments:

> there is no evidence of functional impairment as of [plaintiff's] last day worked forward. A fatty liver was documented as well as alkaline phosphatase and vitamin D deficiency; however, these findings do not impair [plaintiff's] functional capacity. [Plaintiff's] physical examinations consistently reveal . . . no deficits in range of motion, no synovitis, motor strength, coordination, tone and reflexes are all noted to be normal.  The EMG/NCS and MRI findings were all . . . normal. [There is no] evidence of significant adverse side effects related to [plaintiff's] medications, with the exception of the withdrawal of Cymbalta and Methadone[, which] symptoms appear to have resolved . . . . The treatment of chiropractic care, yoga, massage therapy is noted to be appropriate for [plaintiff's] conditions; however there is no support for any restrictions or limitations that would preclude [plaintiff] from working as of [her] last day worked. [Plaintiff's] condition is chronic and there is no documented worsening of [her] conditions of such severity that it would render [her] unable to work. The presence of trigger point tenderness does not translate into loss of functional capacity. [Her] self-reported pain complaints are not substantiated by any clinical or diagnostic findings. The decision to disallow [plaintiff's long term disability benefits] claim was appropriate and is therefore, being upheld on first appeal.

(Exh. 27, GAL 0162).

_____On July 6, 2007, plaintiff filed a second appeal with defendant, which included

additional medical records and a report from Dr. Varma, in which he contests: (1) Dr.

Howard's opinion that plaintiff's complaints of pain are not substantiated by any clinical or

diagnostic findings as Dr. Varma made a clinical determination of trigger point tenderness

and diagnosed chronic fatigue; (2) Dr. Howard's finding that plaintiff's complaints of pain are

subjective and are not supported by the medical records; (3) Dr. Howard's failure to reject

or endorse Dr. Varma's diagnosis of plaintiff's fatigue; and (4) Dr. Howard's emphasis on

plaintiff's range of motion to the exclusion of her chronic pain and chronic fatigue that would

prevent her from standing for her shift and possessing the mental sharpness necessary to

function while performing her job.  (Exh. 130, GAL 0333-0335; see Exh. 32, GAL 0170-0173).

The medical records and Dr. Varma's report were sent to Dr. Howard, and on August 3,

2007, defendant upheld its decision to deny plaintiff's benefits[12] after Dr. Howard sent

defendant an addendum in which he concluded that the additional medical records do not

alter his initial assessment.  (Exh. 34, GAL 0175; Exh. 131, GAL 0336-0340; Exh. 35, GAL

0176-0178).

 According to the final denial letter, dated August 3, 2007, Dr. Howard referenced,

without specifically addressing, nine years of medical records authored by Dr. Katechia,

plaintiff's primary physician, Dr. Varma's records from November 2005 through April 2007,

and "additional medical records" supporting plaintiff's chronic pain.  (Exh. 35, GAL 0176-

0178).

 Dr. Howard's July 24, 2007 addendum, from which defendant  quoted extensively in

its last denial notice, reads that while the "additional medical records indicate that [plaintiff]

had a chronic pain syndrome of a diffuse nature consistent with fibromyalgia," fibromyalgia

"with the presence of tender points does not translate into functional loss in the absence of

corresponding findings of functional deficits" which are not found in plaintiff's medical

records.  (Exh. 131, GAL 0339; Exh. 35, GAL 0177).   Additionally, according to Dr. Howard,

"it is noted that [plaintiff] has cognitive impairment[, but] [t]his is not supported objectively

in the medical records," and "there was no mention [in plaintiff's medical records] of brain

fog, cognitive impairment, [or] inability to calculate."  (Id.).

 While in its briefs, defendant offers many reasons for denying plaintiff benefits,

pointing primarily to the lack of presented evidence demonstrating that plaintiff does not

---

[12]See note 5 supra.

have the functional limitations that prevent her from performing her previous job as a table games floorperson,[13] plaintiff is correct that in its final decision, defendant relied exclusively on the opinion of Dr. Howard.   As discussed above, this Court's scope of review is limited to the evidence in the administrative record.   Thus, this Court must determine whether Prudential's denial of benefits to plaintiff was arbitrary and capricious based on the reasons that Prudential gave at the time of the denial.   Karanda, 158 F. Supp. 2d at 198, n.4, citing Short v. Cent. States, Southeast & Southwest Areas Pension Fund, 729 F.2d 567, 575 (8th Cir. 1984)("A post hoc attempt to furnish a rationale for a denial of pension benefits in order to avoid reversal on appeal, and thus meaningful review, diminishes the integrity of the Fund and its administrators.").   The reasons defendant gave at the time of the denial were the reasons articulated by Dr. Howard, from whose opinion defendant quoted for all of its decision, with the exception of a conclusory paragraph summing up Dr. Howard's determination.   Thus, this Court must determine whether defendant's decision was arbitrary and capricious based on the reasons given by Dr. Howard, and not based on the reasons articulated in defendant's brief.

As stated above, to be found disabled under the terms of the Plan, defendant must determine that:

- you are unable the perform the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.

_____

[13]Defendant also claims that there are no medical records between May 5, 2005 and October 27, 2005 that indicate, subjectively or objectively, plaintiff's pain.  (Dkt. #38, at 8).  The content of the records dated prior to and after those dates clearly suggest that the intervening documents are missing.  That notwithstanding, the lack of these records was not mentioned in defendant's decisions denying plaintiff benefits.

(Exh. 2, GAL 0024)(emphasis in original).

ERISA "requires that a summary plan description of employee benefit plans . . . apprise employees of their rights and obligations under the plan." Karanda, 158 F. Supp. 2d at 203, citing 29 U.S.C. § 1022.  In this case, the Plan requires plaintiff to establish that she is unable to perform the material and substantial duties of her regular occupation.  There is no mention of establishing that plaintiff has "functional limitations," nor are such limitations defined in the Plan.

Plaintiff's employer, defendant's vocational rehabilitation specialist, plaintiff, and Dr. Varma characterized the essential job duties of a table games floorperson as "light," requiring lifting up to ten pounds frequently, up to twenty pounds occasionally and/or frequent walking, standing and/or constant pushing and pulling.  (Exh. 4, GAL 0058; Exh. 8, GAL 0069, 0071; Exh. 138, GAL 0366).  Defendant contends that Dr. Varma's APS, in which she characterizes plaintiff as capable of performing "light" work, "did not contain any limitations on her ability to perform her occupation."  (Dkt. #38, at 9).  To the contrary, in that same document, Dr. Varma listed plaintiff's "1) [p]ain[,] 2) [f]atigue[, and] 3) [i]nability to focus," as "[m]edical [o]bstacles to [r]eturn to [w]ork."  (Exh. 8, GAL 0071).  In its earlier decisions that plaintiff retains the functional capacity to perform her job, defendant relied on the "light" work characterizations, to the exclusion of the limitations stated by Dr. Varma in the APS, and to the exclusion of entries in the medical record documenting plaintiff's impairments, and in its final decision, defendant concludes, based on Dr. Howard's opinion, that "[t]here are no corresponding examination findings to support functional impairment," and the "medical evidence supports that [plaintiff] has the functional capacity to perform the material and

substantial duties of her regular occupation." (Exh. 35, GAL 0178).[14]  Further, according to

Dr. Howard, "there was no mention [in plaintiff's medical records] of brain fog, cognitive

impairment, [or] inability to calculate." (Exh. 35, GAL 0177-0178).

Contrary to Dr. Howard's opinion, and accordingly, contrary to the ultimate conclusion

of defendant, the medical record does support plaintiff's claims of chronic pain, chronic

fatigue, and cognitive impairment which render plaintiff "unable to perform the material and

substantial duties of [her] regular occupation due to [her] sickness or injury."[15]  (Exh. 2, GAL

0024).  In fact, in almost every entry by Dr. Varma in a two year period, he references

plaintiff's pain and fatigue, and on several occasions, he noted her complaints of cognitive

impairment.  Specifically, on October 27, 2005, Dr. Varma noted plaintiff's chronic pain,

fatigue, and fibromyalgia, and noted plaintiff's body aches.  (Exh. 71, GAL 0215).  On

---

[14]As discussed further below, defendant's focus on the explicitly noted physical limitations, and the absence of other physical restrictions, at the exclusion of her limitations due to chronic pain, fatigue and cognitive impairment, is arbitrary.

[15]The chronic pain and fatigue is consistent with plaintiff's diagnosis of fibromyalgia.

> Fibromyalgia . . . is a complex, chronic condition which causes widespread pain and fatigue as well as a variety of other symptoms.  The name fibromyalgia comes from "fibro" meaning fibrous tissues (such as tendons and ligaments), "my" meaning muscles, and "algia" meaning pain. . . . [Fibromyalgia] produces pain in the soft tissues located around joints and in skin and organs throughout the body.  Because [fibromyalgia] has few symptoms that are outwardly visible, it has been nicknamed "the invisible disability" or the "irritable everything" syndrome.

> The pain of [fibromyalgia] usually consists of diffuse aching or burning described as "head-to-toe," and it is often accompanied by muscle spasm.  Pain can vary in severity from day to day and change location, becoming more severe in parts of the body that are used the most (i.e., neck, shoulders, and feet).  In some people, it can be so intense that it interferes with the performance of even simple tasks, while in others it may cause only moderate discomfort.  Likewise, the fatigue of [fibromyalgia] also varies from person to person ranging from a mild, tired feeling to the exhaustion of a severe flu-like illness. [Fibromyalgia] can make life very challenging on many different levels.

(Exh. 140, GAL 0401).

January 10, 2006, Dr. Varma noted plaintiff's fatigue and her increase in aching and pain, for which her methadone was increased. (Exh. 75, GAL 0220-0221). Two months later, on March 15, 2006, Dr. Varma noted plaintiff's report that she "[c]ontinues to feel foggy," and is "able to manage her pain but the pain still remains between 6 and 9, worse pain of feet, hands, knees, and other joint area[s]." (Exh. 78, GAL 0225-0227).[16]

On April 14, 2006, Dr. Varma noted that lab results revealed elevated alkaline phosphates, and that plaintiff had a positive rheumatoid factor, but that "[m]ethadone [was] just hold[ing [her pain] under reasonable control." (Exh. 84, GAL 0236-0237; see Exhs. 85-86, GAL 0238-0240). Dr. Varma noted plaintiff's "good range of motion" of her extremities (Exh. 84, GAL 0236), but two months later, that range of motion notwithstanding, Dr. Varma noted plaintiff's report that she "continues to feel fatigued, tired, and achy, feels as if she has a foggy head, and finds it difficult to concentrate." (Exh. 91, GAL 0248-0250).

---

[16]See note 15 supra.

Dr. Varma referred plaintiff to Dr. Tinklepaugh for a neurological work-up. (Exh. 78, GAL 0225-0226). On March 29, 2006, Dr. Tinklepaugh saw plaintiff for her chief complaint of "burning in her hands and feet." (Exh. 80, GAL 0230-0231). Plaintiff reported difficulty going upstairs, abnormal sensations in her feet, difficulty with her grip strength, and starting to drop things. (Id.). According to Dr. Tinklepaugh, plaintiff's "[m]uscle bulk and tone [were] normal in both upper and lower extremities," and "[r]esistance testing reveals 5/5 strength in both upper and lower extremities." (Id.). Two weeks later, Dr. Tinklepaugh noted that an MRI performed did not show any evidence of demyelinating disease. (Exh. 81, GAL 0232; see also Exhs. 82-83, GAL 0233-0235).

On June 21, 2006, Dr. Tinklepaugh noted that plaintiff "has not gotten worse, has not improved." (Exh. 93, GAL 0252-0255). He noted that she has full and symmetrically bilateral motor strength, and she has normal sensations in her lower extremities to temperature that stays normal up to her thighs, "which [was] different than before," when she had decreased temperature sensations mid shin level. (Id.). Dr. Tinklepaugh noted plaintiff's normal nerve studies and "mild neuropathy." (Id.).

According to Dr. Varma, the "mere fact that a person who suffers from both chronic pain and chronic fatigue and has a relatively good range of motion does not mean that such a person could function on a full time basis at [plaintiff's] job." (Exh. 130, GAL 0334).

On June 29, 2006, Dr. Varma noted plaintiff's "[r]eal flare of fibromyalgia," as plaintiff reported increasing pain over the past two weeks.  (Exh. 96, GAL 0260).   On July 10, 2006, Dr. Varma noted plaintiff's chronic fatigue, and one month later, Dr. Varma noted that plaintiff's pain was inadequately controlled by methadone.  (Exhs. 97-98, GAL 0261-0269). Dr. Varma took plaintiff off methadone, which caused withdrawal, and instead tried a trial of Duragesic.  (Exh. 100, GAL 0271–0272).  Plaintiff also experienced withdrawal symptoms when she was taken off Cymbalta.  (Id.).  Plaintiff reported fatigue and an inability to concentrate.  (Id.).  Dr. Varma advised that plaintiff needed to continue yoga for better range of motion.  (Id.).[17]

On September 15, 2006, Dr. Varma opined that plaintiff should remain out of work until November 1, 2006 at which time she would be re-evaluated.  (Exh. 102, GAL 0275). Three weeks later, Dr. Varma noted that increasing the Duragesic has "made some difference," but noted plaintiff's complaints of pain and fatigue, with fatigue being "the bigger issue."  (Exh. 109, GAL 0283-0286).

In a letter dated October 18, 2006, plaintiff's massage therapist, Christopher Briggs, noted that he has been seeing plaintiff since 2004, and that during her visits, she "consist[e]ntly exhibits excessive chronic pain, chronic fatigue, and brain fog."  (Exh. 111,

---

[17]Plaintiff has been taking yoga classes since January 2006. (Exh. 21, GAL 0133-0137). A letter written by plaintiff's yoga instructor, Carol Klammer, dated September 23, 2006, explained that plaintiff's yoga classes are "specially modified . . . for people dealing with health issues . . . [and] is intended to provide gentle movement and exercise . . . ." (Id., GAL 0133).  Ms. Klammer also noted that plaintiff's "attendance in the class was unquestionably an effort to maintain her health, strength and mobility and ease pain. [Her] attendance . . . was sporadic because of the pain levels she was enduring." (Id.).

In a letter dated September 19, 2006, plaintiff's reflexologist documented her treatment of plaintiff for the past year for the extreme tightness in her muscles as a result of plaintiff's fibromyalgia.  (Exh. 103, GAL 0276).

GAL 0288-0289).  The next day, Dr. Varma noted that he has treated plaintiff for her chronic

pain associated with fibromyalgia, as well as fatigue, elevated alkaline phosphatase levels,

positive rheumatoid factor, and hypercholesterolemia, and that in his "best medical opinion

that [plaintiff] remain out of work until further notice."  (Exh. 112, GAL 0290).

On October 31, 2006, plaintiff presented Dr. Varma with a completed Pain Disability

Index in which she rated nearly all the factors greater than eight, with the worst being ten

out of ten.  (Exhs. 113-14, GAL 0291-94).[18]  In February and  April 2007, plaintiff completed

Pain Disability Indexes in which she rated herself at 9.5 in most of the factors.  (Exh. 121,

GAL 0320-0321; Exh. 127, GAL 0329-0330).

Further, while it is true that the majority of Dr. Katechia's records do not address

plaintiff's fibromyalgia, pain or fatigue,[19] as of 2005, Dr. Katechia, who did not treat plaintiff's

---

[18]Dr. Varma referred plaintiff to a pain clinic, at which she was evaluated, and to a neuropsychologist.  (Exhs. 114-15, GAL 0293-0300).  Plaintiff was seen at Select Behavioral Health for depression from February until April 2007.  (Exh. 120, GAL 0315-0319; Exhs. 122-26, GAL 0322-0328).

[19]While defendant's decision does not reference the specific medical records of Dr. Katechia, listed below are his records, and unrelated records from other treating doctors, which were included in this administrative record:

Dr. Katechia's medical records, dated April 20, 1998, April 2 and September 30, 2002, January 2, March 31, June 9 and 20, July 28, September 30, December 15, 2003, January 8, February 19, April 29, October 1, 2004, Dr. Terry Baksh's medical record, dated June 10, 2004, the Eastern Connecticut Primary Care office visit notes, dated April 15, 1999, January 31, March 13, October 10, 2000, April 9 and October 4, 2001, February 7, 2007, and records from Drs. Schultz, Kimsey, and Sutila, dated December 19, 2003, all of which reference migraines, sinus problems and plaintiff's preventive care, but nothing remarkably related to plaintiff's chronic pain issues.  (Exhs. 37-52, GAL 0180-0195; Exhs. 54-57, GAL 0197-0200; Exhs. 59-61, GAL 0202-0204).  Additionally, in the record are treatment notes for plaintiff's asthma from Dr. Ber of Shoreline Allergy Associates, L.L.P. (Exh. 107, GAL 0280-0281).

In Dr. Katechia's treatment note, dated January 6, 2005, he noted plaintiff's chronic back and shoulder problems (Exh. 64, GAL 0207).  On April 21, 2006, Dr. Katechia noted plaintiff's "abnormal lab work," that may evidence hypertriglceridemia or hypothyroidism.  (Exh. 87, GAL 0241).  On May 9, 2007, Dr. Katechia noted that plaintiff was "very depressed" but that her depression was stable with Effexor.  (Exh. 129, GAL 0332).

fibromyalgia, noted the diagnosis (Exhs. 66-68, GAL 0209-0212; Exh.  70, GAL 0214; Exh.

72, GAL 0216; Exh.  108, GAL 0282), which, on February 23, 2006 he described as "severe,"

and  noted that plaintiff "is tired all the time, can't do much, and is basically disabled by her

condition."  (Exh. 76, GAL 0223). [20] In addition, in her Comprehensive Claimant Statement,

dated August 1, 2006, plaintiff complained of fibromyalgia, chronic pain, and fatigue.  (Exh.

14, GAL 0090).  Plaintiff noted that she was taking methadone and Cymbalta for pain, and

Nadodol for migraine headaches, and she complained of an inability to stand for long

periods, severe headaches, constant pain, an inability to focus, concentrate or understand

and follow directions, and trouble sleeping.  (Exh. 14, GAL 0092-0094).  She stated that she

required intermittent assistance with her activities of daily living such as bathing and dressing

and she stated she avoided driving unless absolutely necessary because she often got lost

since  her pain affected her ability to concentrate.  (Id.).  Further, when plaintiff appealed

defendant's initial decision to deny her disability benefits, plaintiff submitted a statement

titled, "A Day in the Life of Gail Lanoue," detailing the difficulties she encountered in a typical

day.  (Exh. 22, GAL 0138-0145; Exh. 23, GAL 0149-0150). [21]

        "It has long been the law of [the Second Circuit] that the subjective element of pain

is an important factor to be considered in determining disability."  Connors v. CT Gen'l Life

Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001)(internal quotations & citation omitted). Moreover,

"[w]here the record reveals well-documented complaints of chronic pain, and there is no

_____

[20]On June 8, 2006, Dr. Katechia reported that plaintiff is "stable,"  not in acute distress, and he asked plaintiff to follow-up with her specialists, Drs. Varma and Tinklepaugh.  (Exh. 90, GAL 0247).

[21]Defendant also hired a private detective agency, Factual Photo, Inc., which submitted a surveillance report about plaintiff to defendant, on December 8, 2006; the detectives reported that during the surveillance period, the only videotape they captured of plaintiff was as she opened the front door to let a dog into the house. (Exh. 135, GAL 0349-0353).

evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." Quigley v. Unum Life Ins. Co. of Am., 340 F. Supp. 2d 215, 224 (D. Conn. 2004).

        While defendant contends that "there is no evidence that Prudential refused to consider plaintiff's subjective complaints of pain" (Dkt. #38, at 7), Dr. Howard's opinion, adopted in full by defendant as the basis of its decision, rejected the foregoing in full,[22] in favor of the absence of what Dr. Howard considered "functional impairment[s]." (Exh. 35, GAL 0177-0178).  Furthermore, while defendant claims it "weigh[ed] the subjective evidence against the objective evidence, which failed to establish plaintiff's subjective symptoms or their affect on her ability to perform her occupation" (Dkt. #38, at 7), such conclusion is not supported by the record, which, in addition to plaintiff's subjective complaints of pain and fatigue, includes objective references to plaintiff's fibromyalgia trigger points at 18/18 (Exh. 115, GAL 0295-0296; see Exh. 114, GAL 0293),  plaintiff's muscle spasms (Exh. 77, GAL 0244), and Dr. Varma's report of tenderness at all or nearly all joints on examinations (see e.g., Exh. 84, GAL 0236; Exh. 91, GAL 0248-0250; Exh. 96, GAL 0260; Exh.  97, GAL 0261-0266; Exh. 100, GAL 0271-0272; Exh. 109, GAL 0283-0286; Exh. 114, GAL 0293-0294; Exhs. 115-16, GAL 0293-0301; Exh. 121, GAL 0320-0321).[23]  As United States District Judge

---

[22]As discussed above, according to Dr. Howard,"there was no mention [in plaintiff's medical records] of brain fog, cognitive impairment, [or] inability to calculate." (See Exh. 35, GAL 0177-0178).

[23]Defendant weighed subjective evidence against the lack of objective evidence. "While an administrator may look to objective evidence to evaluate the credibility or severity of reports of pain, it is arbitrary and capricious to deny a disability claim solely based on the unavailability of such evidence." Smith, 573 F. Supp. 2d at 617-18 (citations & footnote omitted).  Even assuming that defendant denied plaintiff benefits on the grounds of lack of objective medical evidence, it is not clear what additional "objective" evidence defendant could have demanded in light of the lack of evidence contradicting plaintiff's reports of chronic pain, chronic fatigue, and cognitive impairment.  See Karanda, 158 F. Supp. 2d at 204-05.

Christopher F. Droney held last summer, it is "unreasonable to require objective evidence to support a diagnosis of fibromyalgia," as fibromyalgia is a condition "diagnosed by subjective pain." Smith, 573 F. Supp. 2d at 617 (citation omitted).  Furthermore, when dealing with fibromyalgia as a disabling condition, "even if [plaintiff's] subjective reports are not supported by objective medical evidence, [plaintiff's] subjective pain by itself may constitute sufficient evidence of a disability." Id. (footnote & citation omitted).

In sum, plaintiff suffers from chronic pain throughout her body that is managed through a combination of pain medication and therapy, from cognitive impairment that deprives her of the mental sharpness needed to perform her work as a table games floorperson, and from chronic fatigue.  Plaintiff's complaints of chronic pain are substantiated by trigger and tender points tests, documented muscle spasms and joint tenderness, and prescriptions for pain medications, and treatment through yoga, reflexology, and massage therapy.  Accordingly, considering defendant's inherent conflict of interest as a factor in this decision, and considering defendant's exclusive reliance on Dr. Howard's opinion, under the arbitrary and capricious standard, plaintiff is entitled to summary judgment as defendant's decision to deny plaintiff benefits is not supported by substantial evidence in the administrative record, and was rendered "after less than a full and fair review." Smith, 573 F. Supp. 2d at 615 (citation omitted).

### 4. FAILURE TO HAVE PLAINTIFF EXAMINED

The Plan permits defendant to have claimants examined by doctors, other medical practitioners or vocational experts of its choice, but the Plan does not require such examination.  (Exh. 2, GAL 0024).  Defendant's "failure to physically examine [plaintiff], or to confer with [plaintiff's] treating physician, is not, by itself, sufficient evidence to prove that

the structural conflict influenced [defendant's] decision to deny benefits." Merrill v. Hartford

Life & Accident Ins. Co., 503 F. Supp. 2d 531, 536 (D. Conn. 2007)(citations omitted).  For

the reasons stated in Section II.A.3. supra, this factor does not alter the Court's conclusion.

### 5. APPLICABILITY OF THE  TREATING PHYSICIAN'S OPINIONS

ERISA requires a "full and fair" assessment of claims and clear communication to the

claimant of the "specific reasons" for denial of a claim for benefits.  See 29 U.S.C. § 1133.

That notwithstanding, nothing in the Act "suggests that plan administrators must accord

special deference to the opinions of treating physicians[,] [n]or does the Act impose a

heightened burden of explanation on administrators when they reject a treating physician's

opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)["Nord"].[24]  While

plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence,

including the opinions of a treating physician," such opinions are not accorded "special

weight . . . nor may courts impose on plan administrators a discrete burden of explanation

when they credit reliable evidence that conflicts with a treating physician's evaluation." Id.

---

[24]The treating physician rule, upon which plaintiff relies, applies to disability determinations made by administrative law judges ["ALJ"] under the Social Security Act.  Specifically, as the Second Circuit has held, when making a determination regarding Social Security disability benefits, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with the other substantial evidence."   Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted); see 20 C.F.R. § 404.1527 (d)(2).  If an ALJ does not give a treating physician's opinion controlling weight, the ALJ considers the following factors in deciding the weight assigned to any medical opinion:

(i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(d)(2). Plaintiff's reliance on these factors is misplaced as Judge Arterton's Karanda decision, wherein the treating physician rule was discussed, was decided three years prior to the Nord decision that is controlling on this issue.

at 834 (footnote omitted); see Quigley, 340 F. Supp. 2d at 223-24.  "Nevertheless, when a plan administrator categorically rejects a treating physician's recommendations, it must provide valid reasons for doing so."  Merrill, 503 F. Supp. 2d at 536 (citation omitted).  In this case, rather than providing such reasons, defendant acted in contravention of the Supreme Court's admonition against "arbitrarily refus[ing] to credit a claimant's reliable evidence, including the opinions of a treating physician."   Nord, 538 U.S. at 834. Accordingly, for this reason and the reasons discussed above, defendant's final decision was arbitrary and capricious.

## B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. #30)

As in plaintiff's Motion, defendant agrees that under the applicable standard of review for a motion for summary judgment under ERISA, defendant is entitled to judgment in its favor as its decision was not arbitrary and capricious (Dkt. #32, at 3-14); defendant argues further that defendant's initial decision to deny plaintiff benefits was consistent with the terms of the Plan (id. at 8-12), and ERISA does not require the courts to give deference to the opinions of claimant's treating physicians (id. at 12-14).

In response, plaintiff agrees that the arbitrary and capricious standard applies to this case, but argues that defendant cannot proffer a post hoc rationale for its decisions (Dkt. #36, at 1-3); defendant has attempted to justify its decision by citing portions of the record upon which it never previously relied, including Dr. Varma's Physician Statement and the lack of medical records from the UCONN Health Center[25] (id. at 3-6); the rationale actually

_____

[25]Defendant contends that treatment at a pain management clinic is "consistent" with the treatment Dr. Howard opined as appropriate for fibromyalgia, yet there are no records of plaintiff's attendance at the UCONN Pain Management Clinic other than her completed intake form.  (Dkt. #32, at 10-11).  Plaintiff appropriately responds that the lack of medical records from UCONN is a post hoc rationale to support Prudential's decision to deny plaintiff benefits as the absence of such records is never mentioned in the three decisions issued by defendant.  (See Dkt. #36, at 5-6); see

employed by the defendant in arriving at its decision was arbitrary and capricious as it relied heavily on the opinion of Dr. Howard who concentrated on matters "irrelevant to . . . plaintiff's illness" (id. at 6); defendant did not properly consider the medical evidence before it (id. at 8); and plaintiff agrees with defendant that while the opinion of the treating physician is not controlling in an ERISA case, opinion is entitled to substantial weight, thus affording more weight to the opinion of Dr. Varma than to the opinion of Dr. Howard.  (Id. at 7-8).

In its reply brief, defendant argues that the reasons for its decision were  sufficiently stated in its Notification of Benefit Determination letters, and were not provided post hoc (Dkt. #40, at 1-6); in making its decision defendant correctly focused on the terms of the Plan and the information plaintiff submitted in support of her claim (id. at 6-7); and defendant considered the opinions of plaintiff's treating physician but it was not obligated to give special weight to his opinion (id. at 7-10).

For the reasons stated in Section II.A.3 supra, defendant's Motion for Judgment on the Administrative Record (Dkt. #30) is denied.

## II. CONCLUSION

For the reasons stated above, plaintiff's Motion for Summary Judgment (Dkt. #29) is granted, and defendant's Motion for Judgment on the Administrative Record (Dkt. #30) is denied.

See 28 U.S.C. § 636(b)(**written objections to ruling must be filed within ten days after service of same**);  FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rules for

Short, 729 F.2d at 575 ("A post hoc attempt to furnish a rationale for a denial of pension benefits in order to avoid reversal on appeal, and thus meaningful review, diminishes the integrity of the Fund and its administrators.").

United States Magistrate Judges, United States District Court for the District of Connecticut;

Small v. Secretary, H&HS, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

       Dated this 20th day of March, 2009, at New Haven, Connecticut.


                 __/s/ Joan G. Margolis, USMJ_____
                 Joan Glazer Margolis
                 United States Magistrate Judge